**MT. CLEMENS AUTO CENTER INC., Plaintiff,**

v.

**HYUNDAI MOTOR AMERICA, Defendant.**

**Case No. 12–11282.**

United States District Court, E.D. Michigan, Southern Division.

Oct. 9, 2012.

James P. Brennan, Robert C. Davis, Davis Burket Savage Listman Brennan, Mt. Clemens, MI, for Plaintiff.

Randal M. Brown, Plunkett Cooney, Detroit, MI, Elizabeth A. McNellie, Baker & Hostetler, Columbus, OH, for Defendant.

*OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS*

DAVID M. LAWSON, District Judge.

Plaintiff Mt. Clemens Auto Center, Inc. operated a dealership in Jackson, Michigan selling automobiles manufactured by the Korean car company, Hyundai Motors. Mt. Clemens obtained its inventory of new vehicles under a franchise agreement (dealer agreement) with defendant Hyundai Motor America (Hyundai). When Mt. Clemens lost its floor plan credit source, Hyundai terminated the franchise agreement for violation of a provision requiring the dealer to maintain a source for financing the purchase of inventory. Both the agreement and Michigan law provide protection to auto dealers against unreasonable actions of manufacturers, including termination of dealership agreements. Mt. Clemens filed a complaint, which it amended once, alleging that the defendant breached the dealer agreement and violated Michigan law when it would not allow the plaintiff to transfer the dealer agreement to another entity that was able to satisfy the floor plan credit source requirements. The defendant has filed a motion for judgment on the pleadings, which is presently before the Court. The Court heard oral argument on October 3, 2012, and now finds that, when taken as true, the allegations in the amended complaint do not demonstrate that the defendant breached the dealer agreement or violated Michigan law governing automobile manufacturers and their relationships with their dealers. Therefore, the Court will grant the defendant's motion and dismiss the complaint.

## I.

On December 25, 2009, Mt. Clemens and Hyundai entered a dealer sales and service agreement, which established Mt. Clemens as an authorized dealer of Hyundai cars in Jackson, Michigan. Under the dealer agreement, Mt. Clemens agreed "to obtain, maintain and increase as [Hyundai] may require, adequate flooring and lines of credit from any reputable financial institution or other credit source." Answer, Ex. A, Dealer Agreement ¶ 13(B). On April 14, 2011, Hyundai learned that JP Morgan Chase had placed Mt. Clemens's wholesale financing arrangements "on hold." On August 4, 2011, Hyundai sent Mt. Clemens a notice of termination stating that "the Agreement shall be terminated within 90 days of your receipt of this letter, which we calculate to be no later than November 7, 2011." Compl., Ex. 1, Notice of Termination Letter at 2.

Mt. Clemens sued Hyundai in Jackson County, Michigan circuit court for an injunction to prevent Hyundai from terminating the agreement. Hyundai removed the case to this Court, but the case was remanded on jurisdictional grounds. On November 4, 2011, the Jackson County court ordered a temporary injunction prohibiting the termination of the agreement. About three months later, on January 24, 2012, Mt. Clemens sent Hyundai a letter with a proposed purchase agreement under which Wolverine Hyundai, LLC agreed to buy "the Hyundai Franchise" from Mt. Clemens. The letter stated that "Wolverine Hyundai will be initially capitalized at Seven Hundred and Fifty Thousand ($750,000) Dollars (unencumbered) and have a One Million Five Hundred Thousand ($1,500,000) Dollars wholesale line of credit (floor plan) solely for new Hyundai vehicles." Compl., Ex. 5, Letter dated Jan. 24, 2012 at 1. Wolverine Hyundai was a yet-to-be formed limited liability company with members consisting of Mt. Clemens's sole owner, Tibor Gyarmati, and a new partner, Keyur Nagrik.

On February 1, 2012, Mt. Clemens and Hyundai agreed to dismiss their lawsuit, and the Jackson County court entered a stipulated order dismissing the action with prejudice that day. Also that same day, Hyundai sent Mt. Clemens a letter declining to approve the sale to Wolverine Hyundai, reasoning that the dealer agreement had been terminated already. Hyundai explained in its letter:

As you are aware, the termination of Hyundai of Jackson became effective February 1, 2012. As a result, Mt. Clemens Auto Center, Inc. no longer holds any asset for which Hyundai Motor America's consent to transfer is required. Therefore, the enclosed document, proposing a change of ownership structure at your former dealership, is not relevant to Hyundai Motor America and is being returned to your attention.

Compl., Ex. 7, Letter dated February 1, 2012. In response to further inquiry by Mt. Clemens's attorney, Hyundai's attorney sent a letter on February 7, 2012 reiterating that Hyundai would not rescind the termination, and that the submission of the proposed asset transfer had no effect on the termination process or its effective date.

Following that exchange of letters, Mt. Clemens filed another lawsuit in Jackson County seeking damages for breach of contract and an order requiring Hyundai to rescind its termination of the franchise. Hyundai removed the second action to this Court on March 21, 2012, this time successfully. Hyundai answered the complaint on March 22, 2012 and filed its motion for judgment on the pleadings, which is pending presently.

## II.

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) applies the same standards that govern motions to dismiss under Rule 12(b)(6). *See* Fed.R.Civ.P. 12(c); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir.2006); *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511–12 (6th Cir.2001). Rule 12(b)(6) authorizes dismissal for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). When deciding a motion under that Rule, "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Cline v. Rogers,* 87 F.3d 176, 179 (6th Cir.1996). "[A] judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations." *Columbia Nat'l Res., Inc. v. Tatum,* 58 F.3d 1101, 1109 (6th Cir.1995). "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Ibid.* "To survive a motion to dismiss, [a plaintiff] must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)." *Fabian v. Fulmer Helmets, Inc.,* 628 F.3d 278, 280 (6th Cir. 2010).

In count I of its amended complaint, Mt. Clemens alleges that Hyundai breached the provision of the dealer agreement that prohibits Hyundai from unreasonably withholding consent to the transfer of the dealership. Mt. Clemens also cites sections of Michigan law, Mich. Comp. Laws § 445.1574(1)(k) & (m), that prohibit manufacturers from unreasonably withholding

consent to the transfer of a dealership to a qualified buyer. Count III of the amended complaint parrots the allegations in count I and asserts a cause of action based on the Michigan law. (Counts II and IV of the amended complaint ask for various forms of relief—an injunction and declaratory judgment, respectively—and do not assert other independent causes of action.). The basis of the plaintiff's claims is that its earlier floor plan financing lapse amounted to a failure of sales performance, which, under Michigan law, justified terminating the dealer agreement only if after 180 days the failure had not been cured. Mt. Clemens believes that the prospect of transferring the dealership to a new entity that had the financial wherewithal to finance the floor plan cured the performance failure, and it did so within 180 days to boot. Since the new entity to be formed is a qualified buyer, Mt. Clemens reasons, Hyundai is required to approve the transfer.

Hyundai sees thing quite differently. It argues that its stated reason for terminating the franchise—the failure of Mt. Clemens's floor plan financing—was an outright breach of the dealer agreement, not a mere failure to perform. As such, the dealer was entitled to 60 days notice under the dealer agreement and 90 days under Michigan law before termination, but it was not entitled to an opportunity to cure. And although the state court injunction may have held off the termination (which was to have occurred otherwise on November 7, 2011), the termination became effective when the lawsuit was dismissed on February 1, 2012. Hyundai reasons that at that point, Mt. Clemens had no dealership interest to transfer, so Hyundai had nothing to approve or disapprove. And even if an interest remained in viable form on that date, Hyundai had 60 days under state law to consider a proposed transfer before it had to respond (citing Mich.

Comp. Laws § 445.1574(1)(*l*)), and the proposal was submitted only six days prior to the termination. Therefore, Hyundai insists, it did not violate any contractual or statutory duty to deal in good faith. Hyundai also points out that in any event, Mt. Clemens did nothing to remedy the breach on its own part, and that proposing a third party to take over those obligations does not count as a cure.

Under Michigan, law a manufacturer may terminate an auto dealer's franchise agreement only for cause, and the dealer is entitled to advance notice of termination and, in some cases, an opportunity to cure, depending on the cause for termination. A manufacturer may terminate a franchise agreement if the dealer fails to meet sales performance requirements, but only if (1) the dealer was afforded a reasonable opportunity to exert good faith efforts to carry out the dealer agreement, and (2) the failure continued for more than 180 days after the manufacturer gave written notice of the problem. Mich. Comp. Laws § 445.1567(3). Otherwise, a manufacturer may terminate a dealer franchise if (1) the dealer failed to comply with a provision of the dealer agreement, (2) the provision is reasonable and of material significance to the relationship between the manufacturer and dealer, and (3) the manufacturer first acquired actual or constructive knowledge of the failure not more than two years before the date of its notice to the dealer. Mich. Comp. Laws § 445.1567(2).

The dealer agreement in this case contains its own termination provisions. Paragraph 16(B)(2) lists 21 specific breaches for which Hyundai may terminate the agreement and states:

> If [Hyundai] learns of any of the following events and determines, in its sole discretion, that the matter may require

termination of this Agreement, [Hyundai] will so advise [the dealer] in writing. If [the dealer] does not correct the condition or explain the matter to [Hyundai's] satisfaction within thirty (30) days of such notice, then [Hyundai] will have the right to terminate this Agreement upon sixty (60) days notice.

Answer, Ex. A, Dealer Agreement at 17, ¶ 16(B)(2). The termination clause in Paragraph 16(B)(2) allows for no right to cure after a notice of termination, and provides no further procedure for termination, but expressly states that if Hyundai is not satisfied with the dealer's action within 30 days of the first notice of a breach, then Hyundai "will have the right to terminate this agreement" on 60 days notice.

Termination for failure to meet sales performance requirements is governed by a separate provision in Paragraph 16(B)(3), entitled "Termination for Failure of Performance," which states that if Hyundai determines, after an evaluation, that the dealer is not meeting sales performance requirements, then Hyundai will (1) "review promptly with [the dealer] the nature and extent of [the failure]"; (2) notify the dealer in writing and allow 180 days to improve performance; and (3) if the dealer fails or refuses to improve performance, or has not made "substantial progress" on improving by the end of 180 days, then Hyundai may terminate the agreement on 60 days notice. Answer, Ex. A, Dealer Agreement at 19, ¶ 16(B)(3).

Under both the dealer agreement and the statute, a critical question here is whether the failure of the plaintiff to maintain its floor plan financing amounts to a failure to perform in sales or service on one hand, or a breach of a non-sales-performance provision of the dealer agreement on the other. The rules of contract construction and statutory interpretation point ineluctably to the latter.

In construing the meaning of a statute, the court must seek the intent of the legislature and refer first to the statute's plain language. *Chrysler Corp. v. C.I.R.*, 436 F.3d 644, 654 (6th Cir.2006); *Herman v. Fabri Centers of Amer., Inc.*, 308 F.3d 580, 585 (6th Cir.2002). Similarly, when construing a contract or one of its provisions, the intentions of the parties govern. *First Nat. Bank of Ypsilanti v. Redford Chevrolet Co.*, 270 Mich. 116, 121, 258 N.W. 221, 223 (1935). To ascertain the parties' intentions, the Court looks first to the language in the written agreement. *Haywood v. Fowler*, 190 Mich.App. 253, 258, 475 N.W.2d 458, 461 (1991) ("Where the language of a contract is clear and unambiguous, the intent of the parties will be ascertained according to its plain sense and meaning."); *see also Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 61, 664 N.W.2d 776, 787 (2003) ("Well-settled principles of contract interpretation require one to first look to a contract's plain language. If the plain language is clear, there can be only one reasonable interpretation of its meaning and, therefore, only one meaning the parties could reasonabl[y] expect to apply. If the language is ambiguous, longstanding principles of contract law require that the ambiguous provision be construed against the drafter." (citation omitted)). "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided." *Dillon v. DeNooyer Chevrolet Geo*, 217 Mich.App. 163, 166, 550 N.W.2d 846, 848 (1996). The same holds true for statutory construction. *First American Nat'l Bank–Eastern v. FDIC*, 782 F.2d 633, 636 (6th Cir.1986) ("The rule that where the statute contains no ambiguity, it must be taken literally and given effect according to its language is a sound one not to be put aside to avoid hardships that

may sometimes result from giving effect to the legislative purpose." (quoting *Helvering v. New York Trust Co.*, 292 U.S. 455, 464, 54 S.Ct. 806, 78 L.Ed. 1361 (1934) (internal citations and quotation marks omitted))).

█ The plain language of the dealer agreement supports the conclusion that failure to maintain financing was an independent breach of an express, material term of the agreement, not a failure to meet sales performance requirements. There are several reasons why this is so.

First, the termination provisions of the agreement set forth separate and contrasting treatment for breaches of the capital standard provision and breaches of the sales performance provisions. Among the 21 specific grounds listed in Paragraph 16(B)(2) for which Hyundai may terminate the dealer agreement is "[f]ailure of [the dealer] to establish or maintain required net working capital or adequate wholesale credit." Answer, Ex. A, Dealer Agreement at 18, ¶ 16(B)(2)(k). As mentioned above, termination for failure to meet sales performance requirements is governed by a separate provision in the agreement, in which there is no reference to inventory financing.

Second, the provisions in the agreement relating to sales performance are wholly separate and distinct from those that set forth capital requirements. Paragraph 10 governs the obligations of the dealer relating to "Sale of Hyundai Products." Paragraph 10(A)(1) requires that the dealer purchase Hyundai vehicles in adequate quantities to fulfill its obligations. Paragraph 10(B)(1) requires that the dealer use its "best efforts" to market and sell Hyundai vehicles in its primary market. Paragraphs 10(C)(1) and 10(D)(1) require that the dealer organize and maintain an adequate and trained sales force, and require its salespeople to participate in sales train-

ing provided by Hyundai. And Paragraph 10(E) sets forth the criteria for "Evaluation of Dealer's Sales Performance." Mt. Clemens presents nothing in its pleadings to suggest that Hyundai alleged any violation of those specific sales performance clauses.

Third, the provisions in Paragraph 10(E) regarding evaluation of sales performance set forth a detailed process and criteria for evaluating the dealer's sales performance, which do not apply in any way to the capital standards requirements. Paragraph 10(E) requires that Hyundai (1) evaluate sales performance at least annually, (2) review evaluations with the dealer, to allow the dealer to take "prompt action" to improve performance, and (3) provide copies of evaluations on request. That paragraph also sets forth the factors that Hyundai may consider in evaluating sales performance, including (1) comparison of the dealer's sales to sales in the local market, region, or nation, (2) the trend of the dealer's performance over a reasonable period of time, and (3) "[s]ignificant local conditions" that could affect the dealer's sales performance.

In contrast, Paragraph 13 sets forth the "Capital Standards" and requires that the dealer maintain adequate working capital and lines of credit. That section of the agreement does not set forth any factors for evaluating the dealer's credit lines, does not require Hyundai to report its evaluation of the dealer's credit at any time, and provides no period for remedial action by the dealer to correct a credit shortfall. Paragraph 13 merely states that the dealer must maintain capital and financing "as [Hyundai] may require."

The plaintiff argues that floor plan financing was essential to sales performance, and the failure to maintain financing to purchase adequate inventory can be

viewed as a sales performance failure. That may be true, but a reading of the dealer agreement leads to the unavoidable conclusion that the parties treated the sales performance requirements separate from the financing requirements. If financing went away, poor sales performance might well follow; but it is a stretch to say that one amounts to the other. The contract language makes the two distinct.

And there is no support for the argument that losing its floor plan financing constituted a "failure by the new motor vehicle dealer to comply with a provision of the dealer agreement relat[ing] to the performance of the new motor vehicle dealer in sales or service." Mich. Comp. Laws § 445.1567(3). In some ways, all the requirements of the dealer agreement— maintaining adequate capitalization and physical facilities, complying with state and local law, keeping proper books and records, maintaining licenses—"relate[ ] to" sales performance. But "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Discount Tobacco v. U.S.*, 674 F.3d 509, 549 (6th Cir.2012) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)) (internal quotation marks omitted). Accepting the plaintiff's argument that any dealer obligation that somehow could "relate to" sales triggers the 180–notice–and–cure provision in the statute would distort the meaning of the overall legislation.

The Court is satisfied that the floor plan financing provision is a general contract obligation and not one that relates or amounts to a sales or performance requirement. Therefore, the governing contractual and statutory sections are those that apply to general breaches.

■ As it turns out, the termination of the dealer agreement was not effective until February 1, 2012, when the Jackson County court entered its stipulated order to dismiss the prior action with prejudice. The original notice of termination stated that it was effective November 7, 2011, but the order of the Jackson County court prevented that termination from becoming effective until January 31, 2012 (180 days after the notice of termination). Mt. Clemens has not pleaded any facts to show that Hyundai changed, withdrew, or extended the notice of termination in any way, nor has it claimed that any order of the Jackson County court delayed the date of termination beyond January 31, 2012. Mt. Clemens attempts to parlay the 180–day period between initial notice and termination as an admission by Hyundai that the cause for termination was poor sales performance. However, no such admission can be derived or inferred from the duration of the state court's preliminary injunction, and there is no statement by Hyundai on the present record that would justify such an inference.

■ And the extension of the notice period that resulted from the state court's injunction did not create any new obligation on Hyundai's part to entertain a dealership sale. If Hyundai had any obligation to consider the proposed transfer, that obligation did not require it to respond or take any action prior to the termination of the agreement on February 1, 2012. Both the dealer agreement and Michigan law require that Hyundai not "unreasonably withhold consent" to a proposed change of ownership. Mich. Comp. Laws § 445.1574(1)(k); Compl., Ex. 6, Dealer Agreement ¶ 5. But the agreement is silent as to how long Hyundai has to consider a proposed transfer, and the Michigan statute allows a manufacturer 60 days to respond in writing to a proposal, after which a failure to respond is deemed to be consent. Mich. Comp. Laws

§ 445.1574(1)(*l*). Hyundai therefore had no obligation to respond or to take any action on the proposed transfer in the six days between Mt. Clemens's proposed transfer and the termination of the dealership agreement. Once the agreement ended, all obligations of the parties ceased, and nothing required Hyundai to consider the proposed transfer after February 1, 2012.

■ Because it had no obligation to consent to the proposed transfer prior to the termination of the agreement, Hyundai could not have unreasonably withheld its consent. However, even if Hyundai did have some obligation to consent, Mt. Clemens has pleaded no facts to show that Hyundai's withholding was (or would have been) unreasonable. Nothing in the pleadings establishes whether the proposed terms of the transfer and the alleged credit condition of Wolverine Hyundai, LLC were either objectively reasonable in the context of the agreement and the circumstances, or would have met the specific requirements that Hyundai had set. The agreement provides that Mt. Clemens had to maintain financing and credit "as [Hyundai] may require," but Mt. Clemens has pleaded no facts to show what Hyundai did require, or whether the proposed arrangement would have met its requirements. Moreover, Hyundai might reasonably have refused to consent to the transfer for any number of other business reasons, and Mt. Clemens has shown nothing to suggest that those reasons, whatever they might have been, were unreasonable.

■ Finally, even if the reason for termination can be ascribed to a sales performance failure, triggering the 180–day cure provision, Mt. Clemens has not pleaded facts that demonstrate that is cured the breach. The plain language of Paragraph 13(B) states that *the dealer* "agrees to maintain and increase as [Hyundai] may require, adequate flooring and lines of credit...." Answer, Ex. A, Dealer Agreement at ¶ 13(B). Nothing in that language allows Mt. Clemens to satisfy its obligations by offering up a credit-worthy third party as a partner. And nothing in the language of the agreement allows Mt. Clemens to satisfy its credit obligations by proposing a transfer of ownership. The agreement requires that Mt. Clemens maintain adequate credit, and it did not.

Moreover, even if the proposed transfer of ownership could have addressed Mt. Clemens's breach, the time for redress had long passed when Mt. Clemens tendered the proposed sale agreement. The termination provision of Paragraph 16(B)(2) states that Hyundai will allow 30 days *prior to* the notice of termination for the dealer to correct a breach. Hyundai in fact allowed much more. According to the notice-of-termination letter, Hyundai sent its first notice to Mt. Clemens on May 12, 2011 and did not send the notice of termination until August 4, 2011, almost three months later. Once Hyundai issued the notice of termination, it had no further obligations under the agreement to consider any proposed cure of the breach by the dealer.

### III.

The Court finds that even when accepting the facts pleaded in the amended complaint as true, the plaintiff has not stated a claim against the defendant upon which relief can be granted. The allegations in the amended complaint do not establish a breach of the dealer agreement or violation of Michigan law by defendant Hyundai Motor America.

Accordingly, it is **ORDERED** that the defendant's motion for judgment on the pleadings [dkt. # 5] is **GRANTED.**

It is further **ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE.**